# HUSSEY, ADMINISTRATRIX OF CRANE, *v.* UNITED STATES.

## APPEAL FROM THE COURT OF CLAIMS.

No. 32.    Argued November 2, 1911.—Decided November 20, 1911.

One claiming an interest in property and having knowledge of such claim is charged to consider at the time it is sold by trustees whether he will assert his title or retain a share of the proceeds; both vendor and vendee are entitled to timely disavowal in order to protect and indemnify themselves; acceptance of proceeds and failure to disavow may, as held in this case, amount to ratification.

Even if the state court has decided that the widow of a deceased partner had a community interest in his share of real estate belonging to the partnership, if she does not promptly disavow a sale of the entire property made by surviving partners but accepts part of the proceeds, and makes no attempt for many years to assert title, she is guilty of laches and neither she nor her grantees can recover.

Where the reference to the Court of Claims, as in this case, is not to determine whether the grantor of a claimant of a part interest in real estate purchased by the United States had a valid title at the time the United States took possession, but whether the claimant has acquired a valid title to the property, with provision that the United States may plead any defense, the conduct of claimant's grantor is to be considered; and if such grantor was guilty, as in this case, of gross laches, claimant cannot recover.

THE facts, which involve the validity of a claim of title to property in California purchased and occupied by the United States, are stated in the opinion.

*Mr. George A. King* for appellants.

*Mr. Frederick de C. Faust,* with whom *Mr. John Q. Thompson, Assistant Attorney General,* was on the brief, for the United States.

MR. JUSTICE McKENNA delivered the opinion of the court.

The appellants brought this suit in the Court of Claims

for the sum of $40,000, that amount being, it is alleged, the value of their one-sixth of certain real estate in the city of San Francisco at the time possession was taken of the property by the United States.

Jurisdiction of the suit was given by the act of Congress approved February 25, 1905, 33 Stat. 815, c. 800, which is as follows:

"That jurisdiction be, and the same is hereby, conferred on the Court of Claims to hear the claim of Hannah S. Crane and others for the value of certain real property in the city of San Francisco, in the State of California, in which they claim an undivided one-sixth interest, upon the evidence already filed in said court and such additional legal evidence as may be hereafter presented on either side; and if said court shall find that said parties acquired a valid title to said real property as claimed, said court shall award the said parties the market value of the undivided one-sixth of said property at the time possession was taken of it by the United States . . . and any defense, set-off, or counter-claim may be pleaded by the United States, as defendants, as in cases within the general jurisdiction of the court, and either party shall have the same right of appeal as in such cases."

There had been a reference of the claim by a committee of Congress under an act of Congress called the "Bowman Act," in which the court made findings substantially as in the present case, and these findings were certified to Congress, which subsequently passed the act to which we have referred.

The facts, summarized, are: that Congress provided (in 1852) for the establishment of a branch mint in the State of California, and for that purpose authorized the Secretary of the Treasury to make a contract for the erection of a building and procuring the necessary machinery at a sum not exceeding $300,000. The Secretary of the Treasury, in execution of the statute, entered into

a contract for the erection and equipment of the mint, on April 15, 1853, with Joseph R. Curtis, for the sum of $239,900. The title to the property was to be satisfactory to the Attorney General of the United States. A supplemental contract was subsequently made for the purchase of an adjoining lot. The contracts were performed by Curtis, and on May 2, 1854, he executed a deed conveying both lots to the United States, which deed and the title were approved by the Attorney General, and all of the sums due under the contracts were paid to Curtis.

On April 15, 1853, the time of the making of the first contract, the property was owned in fee simple by and was in the possession of Curtis, Perry & Ward, a firm composed of Joseph R. Curtis, Philo H. Perry and Samuel H. Ward. The latter died while on a voyage to the Sandwich Islands. This was not known, and Curtis made the contract for the benefit of the firm.

Ward left a will appointing his partners his executors. The will was probated, but Perry alone qualified as executor. The value of the whole lot named in the contract of April 15, 1853, was appraised at $40,000, and after its appraisement Perry conveyed all of Ward's interest in it to Curtis for the sum of $13,333.33, payment for which he received. The sale was made by Perry as executor under the authority given him by the will.

By the terms of Ward's will nine-tenths of his estate was devised to his wife, Emily H. S. Ward, and her proportion of the sum so received for Ward's interest was paid to her and accepted by her with full knowledge of the sale by Perry as executor, but in ignorance of the extent of her estate in the land in dispute, as shown by the decision of the Supreme Court of the State of California. *King* v. *Lagrange,* 50 California, 328. See also 61 California, 221.

She, with her co-legatees under the will, brought suit on the eighteenth of March, 1854, in the District Court of the United States for the Northern District of California

against Curtis and Perry. The bill alleged the partnership between Ward, Curtis and Perry, the ownership by such partners of the lot, the building thereon, and of the machinery, tools and fixtures in the building then used for assaying purposes; that the contract and its execution by Curtis were for the benefit of the partnership. It also alleged the appraisement of the lot and tools and fixtures, respectively, at $40,000 and $15,150, and the sale of the same by Perry, as executor, to Curtis; that the sale was private, without authority therefor from the Probate Court, and was made for the joint benefit of Perry and Curtis "as co-partners in interest in the contract for the sale of the premises known as the 'United States Assay Office,' and the conversion of the same into a branch mint," and was made to deprive the legatees under the will of their just and legal right to participate in the profits of the sale to the United States; that the sum paid by Curtis to Perry was greatly under the value of the property, in view of the profits arising from the sale to the United States, and that by virtue of the sale Curtis and Perry dealt with the partnership property for their individual gain and advantage, and that they conspired to defraud the complainants of their just share of the purchase money. The object of the bill, therefore, was to obtain for Mrs. Ward and her co-legatees the full benefit, jointly with Curtis and Perry, of the contract with the United States.

Notice of the filing of the bill was given to the Secretary of the Treasury by sending him a copy of it, but prior to its receipt the United States had paid Curtis the sum of $100,000, and balance due was paid at subsequent dates.

The bill was dismissed by complainant's counsel in June, 1854.

In 1855, Perry's acts as executor, which included the disposition of all of the real estate here involved, were approved and he was discharged as executor, Mrs. Ward

and the other legatees under the will joining in the petition therefor.

In 1865, Mrs. Ward conveyed all of her interest in the land to one James L. King, and he, in 1867, brought an action in ejectment therefor against Robert B. Swain, the then superintendent of the mint, which action was subsequently continued against his successor, O. H. Lagrange, they being only in possession as such officers, claiming no title in themselves. The United States district attorney appeared, by direction of the Secretary of the Treasury and the Attorney General, on behalf of the United States and conducted the defense.

The case went twice to the Supreme Court of the State, that court ultimately deciding that the property was the community property of Ward and Mrs. Ward and that one-half thereof vested in her, upon his death, as the survivor of the community, and was not subject to his testamentary disposition, and that it was not established that Ward had attempted to dispose of more than his one-half of the community property or that Mrs. Ward knowingly performed any act indicating, or which could be construed to be, a waiver of her rights under the will and a ratification of the sale of her share of the community property.

The controversy in the case turns on the effect to be given to the decisions of the Supreme Court of California in connection with the jurisdictional act.

The Court of Claims did not question the decisions in so far as they declare that the property was community property and that one-half thereof vested in Mrs. Ward upon Ward's death, and was not subject to his testamentary disposal. The court, however, disagreed with the Supreme Court of California as to ratification of the sale by Mrs. Ward.

Such conclusion appellants contend is precluded on two grounds: (1) the judgment of the Supreme Court of Cali-

fornia became a rule of property and conclusive of the validity of the title; (2) the jurisdictional act confines the inquiry of the court to the existence of the title, and that being in appellants they were entitled to a judgment for the market value of property at the time possession was taken of it by the United States.

(1) This ground is not tenable. *Carr* v. *United States*, 98 U. S. 433, is a parallel case. There, as here, a judgment in an action against officers of the United States in possession of property, in which action the district attorney of the United States by direction of the Secretary of the Treasury appeared and defended, was urged in a subsequent action to estop the United States from contesting the title to the property. It was held that the judgment did not constitute an estoppel. To the same effect is *United States* v. *Lee*, 106 U. S. 196, 217.

(2) The act of Congress gives jurisdiction to the Court of Claims to hear the claim, and if it find from the evidence on file and to be "presented on either side" that the claimants "acquired a valid title to said real property as claimed," it "shall award the said parties the market value of the undivided one-sixth of said property at the time possession was taken of it by the United States." It will be observed, therefore, that jurisdiction was conferred not to ascertain if Mrs. Ward had title at the time the United States took possession, but whether the claimants acquired a valid title, and whether they did or did not necessarily depends upon the effect of Mrs. Ward's conduct. And, besides, the act is careful to say that "any defense . . . may be pleaded by the United States, as defendants."

The defense urged by the United States is the ratification by Mrs. Ward of Perry's conveyance to Curtis. And this defense was sustained by the Court of Claims, and properly so, we think.

The decision of *Beard* v. *Knox*, 5 California, 252, which

defined her interest in the community property, was rendered in the summer of 1855. The exact date is not given, but it was at the July term of the court of that year. Knowledge of it must be attributed to her. There is certainly nothing in the record to show a want of knowledge of it, and the circumstances called for action on her part if she had intended to disavow the sale. About contemporaneously with the decision she received upon the settlement of Perry's accounts as executor of her husband's estate, to which she consented through her trustee, the sum of $37,914.58 and the further sum of $18,893.54, partly in cash and partly in securities. And the findings of fact also show, as we have seen, that at the time of the execution of the deed by Perry to Curtis she received as her nine-tenths of her husband's interest in the real estate conveyed (the other one-tenth going to a legatee under the will) the sum of $13,333.33. Nevertheless she did absolutely nothing to assert a claim to the property for ten years, double the limitation of time within which actions for the recovery of real property in the State of California may be barred; and then all that she did was to convey the property, through her attorney in fact, to one James L. King for the consideration of $100. King let two years more elapse before bringing suit. He recovered judgment, as has been stated, but made no effort to enforce it. He conveyed the property to Charles McLaughlin in 1879, $5 being the consideration expressed. He had previously conveyed a one-third interest in the property to William W. Crane, Jr., and James T. Boyd for a nominal consideration.

We think that the time which Mrs. Ward allowed to elapse, under the circumstances shown by the record, precludes her grantees from asserting title to the property against the United States. She had actual knowledge of all that transpired. It is true that at one time she charged Perry and Curtis with fraud to deprive her and her co-

legatees under her husband's will of their "right to participate in the profits of the sale to the United States" of the real property and some other property. In this suit she did not attack Perry's power to convey the property because of her title to it under her community rights. She and the other complainants alleged only a purpose to defraud them "of their just proportion of the purchase money arising from the sale of the property." Notice of the suit, it is true, was given to the Secretary of the Treasury, but the suit was subsequently dismissed—for what reason it does not appear. It may be that there was a complete and satisfactory adjustment between the parties. And this may reasonably be, if not conclusively, inferred from the proceedings resulting in the settlement of Perry's accounts and his discharge from his trust as executor. Indeed, in the receipt given Perry by the legatees under the will other than Mrs. Ward the suit was referred to and authorized to be dismissed, and he, as executor and individually with Curtis, was released "from all claims, debts, dues or demands due . . . by reason of the contract or under said will, or any other matter or thing." The date of this receipt was July, 1855. This and the other transactions were, we repeat, contemporaneous with the decision in *Beard* v. *Knox*, and Mrs. Ward, then knowing her interest in the property, was charged to consider whether she would assert it or retain what she had received from Perry as executor. And Perry and the United States were entitled to a timely disavowal, if disavowal she intended to make. He then might have been able to defend against it, and the United States, against the consequence of the disavowal, could have sought indemnity against Perry and Curtis. She must be deemed to have ratified the sale.

*Judgment affirmed.*